**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-11-08046-PCT-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Reuben James Dehose, | |
| Defendant. | |

Defendant Ruben Dehose has moved to suppress written and oral statements he made on September 2, 2011. (Doc. 64.) The Court held a hearing on March 12, 2013, during which it received evidence. After consideration of the evidence, the Court grants in part and denies in part Dehose's Motion, as described below.

## BACKGROUND

On May 15, 2010, Cerferino Ethelbah was found dead in his home on the Ft. Apache Indian Reservation in Arizona. He was covered in blood, and the medical examiner determined that Ethelbah (66 years old) died from multiple blunt force injuries. On March 16, 2011, a grand jury indicted Dehose on charges of felony murder, second degree murder, burglary, and assault. (Doc. 1.)

The government first contacted Dehose on May 16, 2010, the day after the incident. Dehose spoke with FBI Special Agent Stephen Hale about his whereabouts on May 15 and his relationship with Ethelbah's family. Dehose had been dating "BJ," Ethelbah's granddaughter, for quite some time. Dehose related to Agent Hale that he had seen BJ dancing with another person the evening of May 15, 2010, and became angry,

1  but denied drinking heavily. No arrest was made at that time. The government continued
2  to investigate Dehose over the next year as evidence developed.

3        Dehose disappeared, however, from August 17, 2010, until September 1, 2011,
4  when he was arrested by tribal police at a casino on the reservation. Agent Hale arrived at
5  the Whiteriver jail at 9:50 AM on the morning of September 2, 2011, and requested an
6  opportunity to check Dehose out for questioning. When Dehose emerged, he saw Agent
7  Hale and swore. Agent Hale told Dehose that he wanted to interview him, but Dehose
8  stated, "I'm not saying shit." Agent Hale said the interview would have to take place at
9  his office in Pinetop because there was no room at the jail.

10        At 10:10 AM, Agent Hale provided Dehose with an advice of rights form. In full
11  the form stated:

12  > Before we ask you any questions, you must understand your rights.
13  > You have the right to remain silent.
> Anything you say can be used against you in court.
14  > You have the right to talk to a lawyer for advice before we ask you any
15  > questions.
> You have the right to have a lawyer with you during questioning.
16  > If you cannot afford a lawyer, one will be appointed for you before any
17  > questioning if you wish.
> If you decide to answer questions now without a lawyer present, you have
18  > the right to stop answering at any time.

19  (Gov't Hr'g Ex. 2.) There was then a break and the following statement, followed by a
20  signature line: "I have read this statement of my rights and I understand what my rights
21  are. At this time, I am willing to answer questions without a lawyer present." (*Id.*) This
22  form was substantially identical to one that Dehose signed for an earlier interview with
23  Agent Hale. (Gov't Hr'g Ex. 1.)

24        Dehose reviewed the form. Agent Hale told him that these were the standard rights
25  read to any interviewee. He then asked Dehose whether he understood those rights, and
26  Dehose answered in the affirmative. Agent Hale next asked Dehose whether he planned
27  on signing the form, or whether Agent Hale would need to write "refused to sign."
28  Dehose said, "I'll sign it, but I'm not saying shit." Agent Hale again asked whether

1 Dehose was going to sign, and Dehose said he would. Dehose signed the form at 10:14
2 AM.

3 Agent Hale permitted Dehose to change his clothes before the drive from the
4 Whiteriver jail to the FBI office in Pinetop. As Dehose was changing, Agent Hale asked
5 him where he had been. Dehose responded, "I'm not telling you anything," and directed
6 further profanities at Agent Hale. Agent Hale reprimanded Dehose for his language and
7 told him that he did not have to speak, but that Agent Hale would not tolerate that
8 language.

9 As they drove to Pinetop, Agent Hale did not ask Dehose any questions. Dehose,
10 however, engaged Agent Hale in "small talk" along the way. At one point, Dehose
11 showed Agent Hale where he had been living with his current girlfriend, who he claimed
12 was watching out for him.

13 The interview began at 11:27 AM. Agent Hale started the interview by stating that
14 "there's no question at all that you did it. It's just a matter of figuring out, you know, why
15 it happened." (Gov't Ex. 3 at 5:10-12.) Agent Hale mentioned that Ethelbah's daughter
16 (and mother of "BJ"), Marcia Massey, wanted to talk to Dehose as soon as she learned he
17 was arrested. (*Id.* at 5:14-22.) Agent Hale talked to Dehose about Massey and her
18 emotions, and Dehose stated his desire to talk to Massey and "BJ." (*Id.* at 6:15-17.)

19 Agent Hale then explained that the tribal court would likely drop their charges
20 against Dehose and that he would be transferred into federal custody based on the grand
21 jury indictment. Agent Hale expressed a desire to get Dehose's fingerprints to match
22 those taken on the scene. At this point, Dehose brought up his prior experience with the
23 federal system. He claimed that federal agents had broken into his house once and treated
24 him roughly. Hale responded, "You still have legal rights. You know, I can't force you to
25 say things. Okay. I can't—but I'm not going to slam your head into the wall just because
26 you don't talk to me." (*Id.* at 19:15-18.)

27 Agent Hale then talked to Dehose about the investigation and the evidence he
28 claimed the government had against him. Agent Hale claimed the government had

1   obtained an order from the Court for Dehose's cell phone records. He also claimed that
2   the investigation revealed Dehose's fingerprints on Ethelbah's window, along with
3   Ethelbah's blood. At the hearing, Agent Hale testified that none of those things were true.

4   Nevertheless, at this point, Dehose began discussing the night of May 15 with
5   Agent Hale. Agent Hale reminded Dehose that he had previously expressed a desire to
6   write out what happened on that night. Dehose agreed that he had. Agent Hale then stated
7   "So I don't know if you would feel better talking to me or writing it down. I'll let you do
8   whatever you feel like you'd rather do. But I don't want to pressure you into this. I don't
9   want to—I'm not going to say, well, you know, you got to say this or else." (*Id.* at 41:14-
10  19.) The interview ceased while Dehose began writing.

11  Around 1:00 PM, Agent Hale and Dehose departed Pinetop for the tribal court in
12  Whiteriver, where Dehose was to appear at 2:00 PM. On the way to the hearing, Dehose
13  again engaged Agent Hale in conversation. At 3:30 PM, Dehose was released into federal
14  custody, and Agent Hale took him back to Pinetop. They again made small talk en route.

15  They arrived back at the Pinetop office at 4:18 PM. During Dehose's absence, a
16  victim witness advocate had retrieved Marcia Massey, Ethelbah's daughter. She had been
17  contacted by the FBI and said that she still wanted to talk to Dehose. Agent Hale placed
18  Dehose in the conference room with Massey alone, but with the tape recorder running.
19  After they embraced, Massey and Dehose talked extensively about their past
20  relationships, the need for Dehose to change his life, obtain forgiveness from God, face
21  the music, pay for what he had done, and similar sentiments. Massey told Dehose that the
22  whole situation was very hard for her and that Dehose had "to just confess and just move
23  on with [his] life." (*Id.* at 27:14-15.) After a lengthy discussion (around 70 minutes),
24  Dehose said that he was sorry, and asked Massey to tell "BJ" he was sorry.

25  Agent Hale and his partner rejoined the conversation at that point. He marched
26  Dehose through the events of the night of May 15, 2010 and Dehose confessed that he
27  was drunk and angry and did beat Ethelbah to death on that night. Massey was present
28  throughout this interview and interjected often.

Dehose has now moved to suppress all written and oral statements made after entering the custody of Agent Hale on September 2, 2011. He relies on *Miranda v. Arizona*, 384 U.S. 436 (1966) and the Due Process clause.

## DISCUSSION

### I. *MIRANDA* CLAIMS

No one "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In order to protect this right, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1965). These procedural safeguards ordinarily take the form of warnings given by law enforcement officers prior to a custodial interrogation: that a suspect may remain silent, that anything he says will be used against him in court, that he is entitled to an attorney, and that an attorney will be provided by the state should he not be able to afford one.

#### A. Initial Invocation

Dehose claims that he invoked his right to remain silent three separate times on the morning of September 2, 2011. When he first saw Agent Hale he said, "I'm not saying shit." When he was presented with the advice of rights form he said, "I'll sign it, but I'm not saying shit." And right after that, when Agent Hale asked Dehose where he had been living, Dehose said, "I'm not telling you anything." The government claims that Dehose did not clearly invoke his right in light of his contemporaneous signing of the advice of rights form.

"Once a person invokes the right to remain silent, all questioning must cease: If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Anderson v. Terhune*, 516 F.3d 781, 784 (9th Cir. 2008) (en banc). There are no magic words required to invoke the right; "a suspect need not speak with the discrimination of an Oxford don." *Davis v. United States*, 512 U.S. 452, 459 (1994) (internal quotation marks omitted). *Miranda*

itself requires only that a suspect "indicate[ ] in any manner . . . that he wishes to remain silent." *Miranda*, 384 U.S. at 473-74. "[N]either the Supreme Court nor this court has required that a suspect seeking to invoke his right to silence provide any statement more explicit or more technically-worded than 'I have nothing to say.'" *Arnold v. Runnels*, 421 F.3d 859, 865 (9th Cir. 2005); *see also Berghuis v. Thompkins*, ___ U.S. ___, ___, 130 S. Ct. 2250, 2260 (2010) ("Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning.")

Dehose clearly and unambiguously invoked his right to remain silent. "I'm not saying shit" is a manifestation of a desire "to remain silent." *Anderson*, 516 F.3d at 784. As the Ninth Circuit noted in *Arnold*, "I have nothing to say" suffices as a clear invocation, and Dehose's statement expresses the exact same wish. The fact that Dehose made his statement at the same time he signed the advice of rights form is no matter. That form specifically provides that he has "the right to stop answering at anytime"; in other words, Dehose can always reinvoke his right to remain silent. Thus the immediate temporal proximity of Dehose's statement and signature does not transform the unambiguous statement "I'm not saying shit" into something ambiguous and unclear. Even if it did, Dehose invoked his right again when, upon questioning from Agent Hale regarding where Dehose had been hiding out, Dehose stated "I'm not telling you anything." "Any waiver, express or implied, may be contradicted by an invocation at any time." *Berghuis*, 130 S. Ct. at 2263-64. Dehose does not need to make a formal declaration. By making his three statements, he invoked his right to remain silent.

### B.     Subsequent Interviews

Once a suspect has invoked his right to remain silent, "all questioning must cease." *Anderson*, 516 F.3d at 784. Police must "scrupulously honor" that right. *Miranda*, 384 U.S. at 479. While the robustness of *Miranda* has ebbed and flowed over time, that core holding has never changed. *Anderson*, 516 F.3d at 788 (collecting cases). The government claims first that Agent Hale sufficiently reminded Dehose of his rights that

1  any subsequent statements after those reminders were effective waivers of Dehose's right
2  to remain silent, and second, that Dehose's course of conduct on the drives to and from
3  Agent Hale's office and during the interview amounted to a waiver of the right to silence.

### 1. *Mosley* and Fresh Warnings

Unlike the right to counsel, see *Edwards v. Arizona*, 451 U.S. 477 (1981), invocation of the right to remain silent does not operate as a total bar on subsequent police questioning. In *Michigan v. Mosely*, 423 U.S. 96 (1975), the Supreme Court recognized both that police questioning following a suspect's invocation of his right to remain silent is especially suspect, and also that *Miranda* permits suspects to make voluntary, intelligent, and knowing waivers. *Id.* at 102-04. It therefore eschewed a per se rule forbidding all reinitiation of questioning post-invocation of the right to remain silent for a case-by-case approach. In *Mosely*, the Court looked at the amount of time that elapsed between interrogations, the provision of fresh warnings, the scope of the second interrogation, and the zealousness of officers in pursuing questioning after the suspect has asserted the right to silence. *Id.* at 104-06. As with all case-by-case inquiries, no factor is dispositive, and the factors cited in *Mosely* are not exhaustive. *United States v. Hsu*, 852 F.2d 407, 410 (9th Cir. 1988). The Ninth Circuit has particularly stressed "the provision of a fresh set of *Miranda* rights." *Id.* at 411 (citing *United States v. Heldt*, 745 F.2d 1275, 1278 n.5 (9th Cir. 1984)).

Because Dehose invoked his right to remain silent, Agent Hale had to cease questioning. Nevertheless, Agent Hale interviewed Dehose in the morning, from around 11:27 AM to 1:00 PM, and again after Dehose was released from tribal custody and after he had spoken with Massey. The government, however, claims that Agent Hale scrupulously honored Dehose's invocation of his right to remain silent. It asserts that, even if Dehose invoked his right to remain silent, Agent Hale reminded Dehose of his rights on several occasions and those reminders were effectively "the provision of a fresh set of *Miranda* rights." *Id.* It cites for support *United States v. Hsu*. In *Hsu*, the suspect invoked his right to remain silent after initial questioning by police. *Id.* at 409. After a

- 7 -

1 period of time, a different agent approached the suspect, advised him of his *Miranda*
2 rights, and asked him whether he understood those rights and would answer questions. *Id.*
3 This time, the suspect answered affirmatively and confessed. *Id.*

4       This is not a *Hsu* situation. Despite Agent Hale and the government's claim that he
5 repeatedly reminded Dehose of his rights, the transcript of their conversations reveals two
6 instances where Agent Hale made passive references to the fact that Dehose was not
7 obligated to do anything. During the first interview, Agent Hale said "You still have legal
8 rights. You know, I can't force you to say things. Okay. I can't—but I'm not going to
9 slam your head into the wall just because you don't talk to me." (Gov't Hr'g Ex. 3 (Part
10 1) at 19:15-18.) Agent Hale did reference, if obliquely, that Dehose did not have to say
11 things. But that statement hardly amounts to a "provision of a fresh set of *Miranda*
12 rights." *Hsu*, 852 F.2d at 411. Indeed, the context of those comments is important. Just
13 previous to Agent Hale's statement, Dehose had rehearsed an incident where he claimed
14 federal agents had treated him roughly. Viewed in that light, Agent Hale's comment
15 looks more like a reassurance that he is not going to beat Dehose to get him to talk.

16       The second instance relied on by the government is when Agent Hale invites
17 Dehose to write out his thoughts about May 15, 2010. Agent Hale states "So I don't know
18 if you would feel better talking to me or writing it down. I'll let you do whatever you feel
19 like you'd rather do. But I don't want to pressure you into this. I don't want to—I'm not
20 going to say, well, you know, you got to say this or else." (Gov't Hr'g Ex. 3 (Part 1) at
21 41:14-19.) This was not a re-Mirandizing of Dehose. Agent Hale is stating only that he is
22 not forcing Dehose to write anything down. No other statements were made during the
23 morning or afternoon interviews that could be construed as re-warnings.

24       Compared with *Hsu*, the case on which the government chiefly relies, Agent
25 Hale's statements fall far short of a "provision of a fresh set of *Miranda* rights." *Hsu*, 852
26 F.2d at 411. The officer in *Hsu* re-read the *Miranda* warnings in their entirety, ensured
27 that the suspect understood them, and obtained a waiver. None of those things occurred
28 here: Agent Hale just made two indirect references to Dehose's rights. None of the other

1  factors cited in *Mosley* are applicable here. Once they began at Agent Hale's office, the
2  interviews all took place between 11:27 AM and 6:00 PM on the same day, within eight
3  hours at most of Dehose's invocation of his right to remain silent. Those interviews
4  continued throughout the subsequent trips back and forth from the office to Whiteriver
5  jail. The interviews all concerned Dehose's activities on the night Ethelbah was killed,
6  and Agent Hale kept up his questioning throughout those interviews. On the evidence
7  before the Court, it cannot conclude that Agent Hale scrupulously honored Dehose's right
8  to remain silent.

### 2.     Waiver

"To admit an inculpatory statement made by a defendant during custodial interrogation, the defendant's 'waiver of Miranda rights must be voluntary, knowing, and intelligent.'" *United States v. Shi*, 525 F.3d 709, 727 (9th Cir. 2008) (quoting *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998)). Validity of a waiver "depends upon the totality of the circumstances including the background, experience, and conduct of defendant." *Id.* (internal quotation marks omitted). A waiver is not presumed—the burden is on the government to demonstrate a waiver by the preponderance of the evidence. *Id.* at 727-28; *Berghuis*, 130 S. Ct. at 2261. Nevertheless, waivers can be implied from a suspect's conduct. For example, "the defendant's silence, coupled with an understanding of his rights and [subsequent] course of conduct [could] indicat[e] waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). Or even "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 130 S. Ct. at 2262. This is because "the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.*

The calculus changes somewhat, however, if a suspect has already invoked his right to remain silent. In that situation, a waiver is not effectuated just because the suspect

1    responds to subsequent questioning from the police. "[U]nder the clear logical force of
2    settled precedent, an accused's postrequest responses to further interrogation may not be
3    used to cast retrospective doubt on the clarity of the initial request itself." *Smith v.*
4    *Illinois*, 469 U.S. 91, 100 (1984); *Anderson*, 516 F.3d at 791 (same). In *Berghuis*, the
5    Supreme Court found that the suspect impliedly waived his rights when he was silent in
6    the face of almost three hours of questioning, but later spoke up. 130 S. Ct. at 2262-63.
7    But the Court noted that, had the suspect actually invoked his rights (instead of merely
8    staying silent), the situation would be radically different: "If the right to counsel or the
9    right to remain silent is invoked at any point during questioning, further interrogation
10   must cease." *Id.* at 2263-64.

11   Thus the mere fact that Dehose responded to Agent Hale's questioning after he
12   invoked his right to silence cannot be used to show a waiver. *See Smith*, 469 U.S. at 100;
13   *Anderson*, 516 F.3d at 791. The government claims, however, that Dehose's conduct
14   subsequent to his invocation of his rights demonstrates a waiver. It relies on the fact that
15   Dehose engaged Agent Hale in conversation both times as they travelled from the
16   Whiteriver jail to Agent Hale's office in Pinetop. The government claims that Dehose's
17   chattiness, in light of his prior experience with the federal investigatory and court
18   systems, is sufficient evidence of waiver.

19   As an initial matter, the government has not directed this Court to any cases where
20   the fact that a suspect waives his right to remain silent as soon as he says anything post-
21   invocation. Invocation of the right to silence does not mean that the suspect must become
22   entirely mute. The appropriate question, then, is the subjects on which Dehose engaged
23   Agent Hale during their drives. During the first drive from the jail to the Pinetop office,
24   Agent Hale testified that Dehose volunteered information about his current girlfriend,
25   where they were living together, how she "had his back," and that he told his girlfriend
26   that he was going to jail for something he did.[1] The majority of the conversation was

---

28   [1] There is no transcript for the first drive from the Whiteriver jail to the Pinetop office.

- 10 -

1    about Dehose's current relationship and living arrangements. While Dehose had
2    previously refused to provide that information to Agent Hale, his later revelation does not
3    mean he waived his rights. It is true that Dehose stated that he told his girlfriend he was
4    going to jail for something he did. This statement hints at possible criminal conduct by
5    Dehose. But, without more, that obscure reference to potential jail time is not enough to
6    indicate that Dehose was now willing, on his own accord, to discuss the murder
7    investigation with Agent Hale. He made that statement in the context of describing his
8    relationship with his girlfriend. Dehose's voluntary statements to Agent Hale on the first
9    drive to Pinetop did not amount to a waiver. Because Dehose had not waived his right to
10   remain silent by the time Agent Hale began his interview with Dehose, and Agent Hale
11   did not effectively re-warn Dehose, all of Dehose's statements (written and oral) made
12   during the interview with Agent Hale must be excluded.

13         The next opportunity for discussion occurred when Dehose and Agent Hale drove
14   back from Pinetop to the Whiteriver jail. They discussed the circumstances of Dehose's
15   arrest by tribal police, his relationship with the Masseys, what was likely going to happen
16   in tribal court, and the surroundings on the drive. Dehose also expressed a weariness from
17   "being on the run." Once again, Dehose's statements on these topics do not manifest a
18   clear intent to waive his right to remain silent. Only one of those topics directly related to
19   the murder investigation—Dehose's relationship with the Masseys, the daughter and
20   granddaughter of the victim. But this discussion was a continuation of a topic on which
21   Agent Hale had initially interrogated Dehose. Dehose sought to confirm that Marcia
22   Massey did in fact want to talk to him, and Agent Hale indicated that she had a lot of
23   questions. This short conversation about Massey is not a clear manifestation of an intent
24   to waive the right to remain silent—Dehose sought to confirm what Agent Hale had told
25   him in an interview that the Court has determined violated Dehose's rights. Dehose did
26   not waive his rights during the drive back from Pinetop to Whiteriver.

27         The final drive occurred after Dehose was transferred from tribal to federal
28   custody. During that drive, Dehose and Agent Hale made small talk. None of the topics

1    they discussed related to the charges against Dehose. Therefore, that conversation is not
2    evidence of a waiver. And, as the Court found above, Agent Hale did not readminister
3    any warnings to Dehose. That means statements made during Agent Hale's afternoon
4    interview with Dehose must be excluded. Dehose had not waived his right to remain
5    silent.

6    In short, the Court has determined that Dehose asserted his right to remain silent,
7    did not waive that right, and Agent Hale did not scrupulously honor that right during his
8    two formal interviews. Therefore, all written or oral statements made during those
9    interviews must be excluded under *Miranda* and the government may not introduce them
10   at trial.

11   **C.     Discussion with Massey**

12   Dehose also seeks to exclude those statements he made during his afternoon
13   discussion with Marcia Massey, Ethelbah's daughter and mother of Dehose's former
14   girlfriend. This conversation took place in a conference room and was not attended by
15   government agents. It was, however, recorded.

16   Private parties are not normally constrained by the language of the Constitution.
17   *See Colorado v. Connelly*, 479 U.S. 157, 166 (1986). Yet in certain situations, "[t]he
18   requirement of a *Miranda* warning may apply to questioning by persons who are not law
19   enforcement officers." *United States v. Roston*, 986 F.2d 1287, 1292 (9th Cir. 1993)
20   (citing *Estelle v. Smith*, 451 U.S. 454 (1981)). *Miranda*'s requirements apply when the
21   person with whom the suspect is speaking is acting "on behalf of the state. . . ." *Jones v.*
22   *Cardwell*, 686 F.2d 754, 756 (9th Cir. 1982). Traditional indicia of an agency relationship
23   guide the determination of whether the private individual is acting on behalf of the
24   government. The Ninth Circuit has looked at whether there was a pre-existing agreement
25   between the private individual and the police, whether the private individual was acting
26   on her own initiative, and whether there was a quid pro quo underlying the private
27   individual's relationship with the state. *See United States v. Pace*, 833 F.2d 1307, 1313
28   (9th Cir. 1987) (none of those factors present when cellmate obtained confession from

defendant); *Roston*, 986 F.2d at 1292 (reciting *Pace* factors).

At the time Massey was speaking with Dehose and encouraging him to confess, she was not acting as the agent of the government. True, the government arranged the meeting between Dehose and Massey. But that was the extent of the government's involvement. The evidence shows that it was Massey who requested an opportunity to speak with Dehose. She came on her own accord. There is no evidence that the government met with her beforehand and provided suggestions on how to get information out of Dehose. Massey was acting on her own behalf—she genuinely wanted to meet with Dehose and discuss the circumstances of her father's death. As the Tenth Circuit has stated, "[a]n agency relationship does not develop where the government is an incidental beneficiary of another party's actions, even where the government admittedly facilitates the conversation that leads to the suspect's decision to reinitiate questioning." *United States v. Alexander*, 447 F.3d 1290, 1297 (10th Cir. 2006). If there was no agency relationship between Massey and the government, there was no interrogation for *Miranda* purposes. *Cf. United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981) (need both custody and interrogation for *Miranda* to be implicated). Thus the fact that the government was recording the interview is not relevant. There was no government interrogation when Dehose was speaking with Massey and therefore any statements made by Dehose during the conversation he had alone with Massey did not violate *Miranda*.[2]

It could be argued that because Dehose agreed to meet with Massey in response to questioning by Agent Hale that violated *Miranda*, his statements to Massey should be excluded under some variation of the "fruit of the poisonous tree" doctrine, seen most often in the context of the Fourth Amendment. But the Supreme Court has been reluctant to apply the doctrine in *Miranda* settings. *See Oregon v. Elstad*, 470 U.S. 298, 308-09 (1985) (refusing to apply the fruit of the poisonous tree to exclude voluntary statements when the officers previously obtained statements in violation of *Miranda*). The Supreme

---

[2] Once Agent Hale joined in, however, it became government interrogation and the conclusions above apply.

- 13 -

Court's instruction in *Elstad* applies to the conversation that Dehose had with Massey: "[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary [here, the statements made during the morning interview]. The relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Id.* at 318. As further elaborated below, Dehose's statements to Massey were voluntary. Therefore, there is no reason to apply a fruit of the poisonous tree-like remedy here.

The Court therefore grants Dehose's Motion to Suppress under *Miranda* the statements made during his two interviews with Agent Hale, and denies Dehose's Motion to Suppress under *Miranda* the statements made during his conversation with Massey.

### D. Statements Made on the Initial Drive

In contrast to the statements made during his interviews with Agent Hale, Dehose's statements during the initial drive from Whiteriver jail were not made in response to interrogation. Dehose did not contest this during the hearing. During the drive, it was Dehose who made voluntary statements to Agent Hale. The statements were not made in response to interrogation. *Miranda* therefore has no application to the statements made in the car on the first trip from Whiteriver. Those were all statements Dehose himself volunteered. Dehose's Motion to Suppress such statements is denied. The statements during the other two trips, however, were continuations of Agent Hale's interview, and consequently those must be suppressed.

## II. VOLUNTARINESS

Independent of the dictates of *Miranda*, the Due Process Clause independently requires that any statement made by a suspect be voluntary. *Elstad*, 470 U.S. at 304-05. "If a suspect's statements had been obtained by 'techniques and methods offensive to due process,' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will,' the statements would not be admitted." *Id.* at 304 (quoting *Haynes v. Washington*, 373 U.S. 503, 515, 514 (1963)). In other words, "[a] confession is involuntary if coerced either by physical intimidation or psychological

pressure." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003). "In cases involving psychological coercion, 'the pivotal question . . . is whether[, in light of the totality of the circumstances,] the defendant's will was overborne when the defendant confessed.'" *Ortiz v. Uribe*, 671 F.3d 863, 869 (9th Cir. 2011*)* (quoting *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993)), *cert. denied*, 132 S. Ct. 1811 (2012)

Dehose claims that his statements made during his interviews[3] were involuntary because (1) Agent Hale lied about the existence of certain evidence, (2) Agent Hale pressed Dehose's relationship with the Masseys, (3) Agent Hale appealed to God, and (4) Agent Hale used Massey to "soften up" Dehose. None of these actions support a finding of involuntariness. Police officers often use deception during interrogation, and the Supreme Court has held that such tactics are well within the range of permissible conduct. *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (holding that a police officer's lie to defendant about his cousin confessing to the commission of a murder was "insufficient in [the Supreme Court's] view to make [an] otherwise voluntary confession inadmissible"). Nor is appealing to a suspect's emotions, morals, or religion inherently coercive. *See Ortiz*, 671 F.3d at 869-70, 871-72; *Miller*, 984 F.2d at 1031-32. Agent Hale was certainly employing a host of tactics and ruses to try to get Dehose to confess, but those tactics were not so coercive as to run afoul of the Due Process clause. Dehose's Motion to Suppress his statements as involuntary is denied.

## CONCLUSION

Dehose's statements to Agent Hale during the first drive from Whiteriver to Pinetop and those made to Massey during their conversation do not violate *Miranda* or the Due Process clause. Dehose's remaining statements to Agent Hale are suppressed under *Miranda*.

/ / /

---

[3] Dehose does not claim that his statements made during his first car trip were involuntary. He does, however, maintain that this Court should determine whether statements excluded under *Miranda* were also involuntary. The necessity of doing so arises from the fact that statements excluded under *Miranda* are still allowable as impeachment evidence, while statements excluded as involuntary are not.

- 15 -

1   **IT IS THEREFORE ORDERED** that Dehose's Motion to Suppress (Doc. 64) is **granted in part and denied in part.**

Dated this 19th day of March, 2013.

*A. Murray Snow*
G. Murray Snow
United States District Judge